(No. 92-CC-0388– )

DANA VAN DER HEYDEN, Claimant, *v.* THE STATE OF ILLINOIS, Respondent.

*Opinion filed April 11, 1996.*

MURPHY, HUPP, FOOTE, MIELKE AND KINNALLY (TIMOTHY D. O'NEIL, of counsel), for Claimant.

JIM RYAN, Attorney General (BRIAN K. FARLEY, Assistant Attorney General, of counsel), for Respondent.

## OPINION

RAUCCI, J.

This matter comes before us after hearing before the Commissioner. On Labor Day weekend, September 3, 1989, Claimant, Dana van Der Heyden ("Claimant"), his wife and several friends visited Starved Rock State Park ("Starved Rock") near Ottawa, Illinois. After approximately an hour hiking on the trails, Claimant, his wife and one of his friends were trying to find their way back to their van in the parking lot near the Riverside entrance. When they spotted a vehicle entrance, they left the trail and cut across a wooded area to a grassy area near the vehicular entrance gate. At the side of the 32-foot double gate, the park administration had constructed barricades designed to keep motorcycles, four-wheel drive and utility vehicles and other off-road vehicles from gaining access to the park during the times when the gates, and

thus the park, are closed. The barricade, built in 1977, consists of 55-gallon drums sunk approximately two-thirds of the way into the ground, allowing about 12 inches of exposed barrel to remain above ground. The drums are filled with concrete and have a cable strung in continuous fashion from the edge of the steel gate to each drum at spaced intervals, with the cable terminating by being wrapped around the trunk of a tree and tied. The cable runs approximately 10 to 12 inches off the ground. In negotiating his way back to the parking lot, Claimant has testified that he tripped over the cable, causing him to fall on his elbow, striking the concrete "lid" in the middle drum of five situated on the east side of the entrance. Claimant sustained serious injury to his elbow, necessitating multiple surgeries and causing Claimant to lose several months of work. Claimant also alleges that his inability to "lock" his elbow has curtailed his career as an HVAC (heating, ventilating and air conditioning) installer, permanently depressed his earning power, and caused him embarrassing disfigurement, pain and suffering, and permanent injury.

The Court does not doubt that Claimant suffered an injury and that it might well have been caused by Claimant's striking a concrete-filled barrel at the park. The question is whether Claimant proved by a preponderance of the evidence that (a) a dangerous condition existed; (b) that the State knew of the condition; and, (c) that the condition caused the fall.

Because the State erected the barricade in question, the State was obviously aware of the existence of the barricade. The question becomes one of whether the barricade, as originally erected and as maintained, presented an unreasonably dangerous condition on July 3, 1989. The question of liability ultimately is whether the State

should have *reasonably foreseen* that pedestrians using the park would decide to cut across established trails, circumvent the gate and would not recognize that a cable had been strung between the barrels used as a barricade.

Claimant relies on the testimony of his expert, Francis W. Biehl, an engineer. Mr. Biehl testified that he relied upon guides used in setting up snowmobiling and skiing trails as well as general forest management guides. It was Mr. Biehl's opinion that the park could have utilized other methods and materials at the accident scene, giving as examples, four-foot upright timbers spaced apart, wooden posts with an upright steel cable hung between, and even using fallen trees or brush. However, the testimony of complex superintendent Jon Blume is compelling. Wooden gates and posts had been used prior to 1977. Motorcycle gangs and other people intent on violating the park's curfew and substance abuse laws, or on committing acts of vandalism would drive over the wooden gates smashing them, use chain saws on other wooden barricades, use winches to tear down post-and-upright barricades, rip trees from the ground, and set fire to brush or logs used as barricades. Only the concrete-filled barrels and cable have effectively deterred lawbreakers. Given the potential for crime and mischief and the State's duty to protect campers from criminal conduct and forest fires, the State's solution is neither draconian nor unreasonable. Mr. Biehl suggested that the cable should have been placed at a higher level, possibly four feet or eye level; however, he had earlier stated that he testified in Michigan concerning a snowmobile decapitation. Mr. Biehl further admitted that during the considerable time he spent observing the barricade and the surrounding area, he saw no one attempt to walk over the barrier as Claimant had attempted.

Finally, Blume and Vecchi, the site superintendent, testified that neither of them have any record or recollection of any report of injury or complaint regarding the barricaded area. Much was made by Claimant of the question of what color the cable was on the day of the injury. We accept the testimony of Claimant's expert that it was a "grayish steel color." Whether the State should have painted the cable a bright yellow or orange is speculation, and does not indicate that a different color cable would have prevented this accident.

Claimant hurt his credibility in at least two instances. First, Claimant's attempts to prove lost wages were lamentable. Claimant admitted that he made about $19,000 to $20,000 in 1988, but reported only $12,703 for 1989, the year in which the injury occurred. This $12,703, representing eight months wages, only extrapolates, at best, to about $19,000, but Claimant stated that $12,703 was that *high* because he had had a "good summer. I made a lot of money." Claimant further testified that during his rehabilitation, his father helped out with checks drawn on the company which employed Claimant, meaning the $12,703 was further inflated from the amount Claimant actually would have earned in 1989 and 1990. The record indicates Claimant would have earned no more than $16,000 to $20,000 per year during the lost time, not $31,000 to $32,000 as Claimant testified. Further, Claimant testified that he had been "made a manager" in 1980, and ostensibly was not an installer, upon which he based his income testimony.

Second, Claimant testified that the cable was dangerous because it was totally obscured by leaves. This would have required leaves piled up to almost ten inches in depth. The difficulty with this reasoning is: (1) Labor Day weekend marks the end of summer and is usually

still extremely warm. The leaves would not have changed color by then, much less fall in the quantities needed to accumulate a layer ten inches deep; and, (2) Claimant's own pictures, taken either "shortly after the accident" or "within one week after the accident," which should, being deeper into the fall, show more fallen leaves, instead show insufficient leaves to cover the grass, much less canopy the cable in question.

The barricade and cable system installed by the State of Illinois at Starved Rock near the main vehicular entrance and in four other areas of the park, was designed to ameliorate a serious problem of criminal trespass to park grounds after curfew. Its design and execution are reasonable under such circumstances. More importantly, the State had no notice that its barricades represented a dangerous condition to park users. The lack of incidents in the 12 years after installation of the barricade but prior to the Claimant's injury, and in the nearly five years after the injury but prior to the trial, indicates to the contrary.

It is therefore ordered, adjudged and decreed that this claim be, and it is hereby, dismissed with prejudice and forever barred.